# Syllabus

Chief Justice:
Elizabeth T. Clement

Justices:
Brian K. Zahra
Richard H. Bernstein
Megan K. Cavanagh
Elizabeth M. Welch
Kyra H. Bolden
Kimberly A. Thomas

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Kimberly K. Muschong

*In re* LANGE

Docket No. 166509. Argued on application for leave to appeal October 9, 2024. Decided April 14, 2025.

The Department of Health and Human Services (DHHS) filed a petition in the Wayne Circuit Court seeking to take jurisdiction of the minor, DVL, from respondent-mother under MCL 712A.2(b)(1) or (2). In June 2021, respondent took DVL, who had a history of mental illness and several mental health diagnoses, to St. John Hospital after he attempted to start a fire in respondent's home and threatened to commit suicide. DVL was held at the hospital, without receiving treatment, while DHHS searched for a suitable inpatient pediatric psychiatric program. However, rather than transferring DVL to such a program, in July 2021, the hospital cleared DVL for discharge and recommended that he return home to receive intensive outpatient mental health services. Respondent refused to pick DVL up from the hospital, explaining that bringing him home would endanger DVL, the family pets, respondent's other children, and herself. DHHS filed its petition, and after several hearings, the trial court, Frank S. Szymanski, J., denied the petition under MCL 712A.2(b)(1) and (2) on the basis that there was no evidence that respondent was neglectful or abusive. Rather, respondent had made numerous efforts to seek help for DVL but was unwilling to put her other children at risk. DHHS appealed, and the Court of Appeals, O'BRIEN and FEENEY, JJ. (REDFORD, J., dissenting), reversed in a split unpublished decision. The Court of Appeals majority held that jurisdiction was appropriate under both MCL 712A.2(b)(1) and (2). According to the majority, a preponderance of the evidence showed that respondent's actions rendered the home environment a place of danger for DVL and her other children and, thus, statutorily unfit. Respondent sought leave to appeal in the Supreme Court. In lieu of granting leave to appeal, the Supreme Court ordered and heard oral argument on, among other things, whether the Court of Appeals correctly concluded that the trial court should have assumed jurisdiction over DVL pursuant to MCL 712A.2(b)(1) and (2). 513 Mich 1032 (2024).

In an opinion by Chief Justice CLEMENT, joined by Justices CAVANAGH, WELCH, and BOLDEN, the Supreme Court, in lieu of granting leave to appeal, *held*:

The trial court did not clearly err by refusing to take jurisdiction of DVL under MCL 712A.2(b)(1) or (2) because respondent was not "able" to provide necessary care and support for DVL at home, and her treatment of DVL was not neglectful.

1. Child protective proceedings are generally divided into two phases: (1) the adjudicative phase, which determines whether the court can take jurisdiction over a juvenile, and (2) the dispositional phase, which determines what action will be taken on behalf of the juvenile. During the adjudicative phase, which was implicated here, the trial court may exercise jurisdiction over a juvenile if a preponderance of the evidence demonstrates that one of the bases for jurisdiction set out in MCL 712A.2(b) applies. MCL 712A.2(b)(1) applies to a child whose parent, when able to do so, neglects or refuses to provide proper or necessary support. Although this Court assumed that respondent, by refusing to take DVL home to receive outpatient treatment after he was discharged from the hospital, failed to provide him with proper or necessary support, the question was whether she was "able to do so." "Able" may be defined as "having sufficient power, skill, or resources to do something." Thus, under MCL 712A.2(b)(1), "able to do so" means that a parent must have "sufficient power, skill, or resources" to provide necessary care and support. Respondent did not have sufficient power, skill, or resources to have DVL return to her home because he posed a danger to himself and to the other members of the household. Even if respondent had worked with DHHS to obtain outpatient services for DVL, those services had previously failed to meet his needs and there was no indication that such services would enable DVL to live at home safely. Accordingly, respondent was not truly "able" to bring DVL home within the meaning of the statute by providing proper or necessary support for him. Therefore, the trial court did not clearly err by refusing to take jurisdiction over DVL under MCL 712A.2(b)(1).

2. MCL 712A.2(b)(2) allows a court to take jurisdiction over a child whose home or environment, by reason of neglect by a parent, is an unfit place for the child to live. The statute incorporates the definition of "neglect" in MCL 722.602(1)(d). In order for there to be "neglect," as defined in MCL 722.602(1)(d), there must be "negligent treatment," which is not defined by the statute. "Negligent" is defined similarly in both a legal and lay dictionary as failing to exercise the care expected of a reasonably prudent person in like circumstances. Respondent's treatment of DVL did not meet this definition of "negligent": she tried to get him the medical treatment he needed, as a reasonably prudent person in her circumstances would have done; and she refused to take DVL home, where he posed a danger to himself and others, which is also what a reasonably prudent person would have done in her circumstances. Thus, respondent did not engage in negligent treatment and thereby commit "neglect" as it is defined by MCL 722.602(1)(d). Therefore, the trial court did not clearly err by refusing to take jurisdiction over DVL under MCL 712A.2(b)(2).

Court of Appeals decision reversed and case remanded to the trial court for reinstatement of its order denying DHHS's petition.

Justice CAVANAGH, concurring, wrote separately to draw the Legislature's attention to the ongoing problem at issue in the case, i.e., DHHS seeking jurisdiction over the child of an otherwise fit parent because the parent is not able to adequately care for a child with severe mental health issues. The available grounds for jurisdiction were ill-equipped to address situations involving children with serious mental health diagnoses. As she did in *In re Holbrook*, 513 Mich 898, 899 (2023) (CAVANAGH, J., concurring), Justice CAVANAGH asked the Legislature to consider creating a no-fault procedure allowing the state to intervene without requiring courts to adjudicate parents as unfit when they are struggling to support children with serious mental health needs.

Justice BERNSTEIN, concurring in part and dissenting in part, agreed that the trial court did not abuse its discretion by holding that jurisdiction was not proper under MCL 712A.2(b)(1) or (2), but he believed that the majority's analysis of culpability under MCL 712A.2(b)(2) was insufficient, and he disagreed that MCL 712A.2(b)(3) provided a basis to obtain jurisdiction over DVL. A finding of culpable conduct by the parent was central to an exercise of jurisdiction by the court under both MCL 712A.2(b)(1) and (2): both provisions provide for jurisdiction, in part, on the basis of a finding of parental neglect, and the Court had previously held in *In re Jacobs*, 433 Mich 24 (1989), that an exercise of jurisdiction under MCL 712A.2(b)(1) necessarily required culpability by the parent. *Jacobs* held that under MCL 712A.2(b)(2), culpability was not a prerequisite for a finding of jurisdiction. After *Jacobs* was decided, however, the Legislature defined "neglect" as used in MCL 712A.2, so *Jacobs* is no longer good law as it relates to culpability under MCL 712A.2(b)(2). By failing to decide whether *Jacobs* remained good law after the statute was amended, the majority opinion failed to provide adequate guidance to courts applying MCL 712A.2(b)(2). Justice BERNSTEIN also disagreed that MCL 712A.2(b)(3)(A) allowed the court to exercise jurisdiction over DVL on the basis that he may be "homeless" because respondent had refused to allow him to return to her home. "Homeless" is not defined in the statute, but according to its lay definition, its use in the statute refers to whether the child has a physical dwelling to which they can return, and there was no indication that the Legislature intended that under MCL 712A.2(b)(3), a child is homeless if their home does not meet their needs. Additionally, the majority's assertion that by choosing not to retrieve DVL when he was discharged from the hospital, respondent may have rendered him homeless would seem to contradict the majority's conclusion that respondent did not act in a culpable manner. That is, if homelessness is defined here in terms of whether respondent rendered DVL homeless, that would inject the issue of parental culpability into an analysis under MCL 712A.2(b)(3), misinterpreting the plain language of the provision. The solution to the problem raised by this case was legislative in nature, not in expanding the scope of MCL 712A.2(b)(3) without a valid basis in law for doing so.

Justice ZAHRA, dissenting, noted that contrary to the majority opinion's holding that respondent and others similarly situated should be excused from refusing to provide care and maintenance for a child when "other barriers" prevent them from taking the child home, such as the risk of danger to the family, a respondent's subjective perception of risk and lack of culpability are not relevant to the statutory objective of a trial court assuming jurisdiction over a child under the Child Abuse and Neglect Prevention Act, MCL 722.601 *et seq*. Rather, even an entirely blameless parent may fail to provide care and maintenance for a child, and DHHS must investigate and take action to protect the child. Further, because the Legislature defined "neglect" in MCL 712A.2(b)(1) and (2), this term no longer has an element of culpability because it does not include a *mens rea* requirement. The only exception under Michigan law allowing parents to refuse to provide a child with necessary and proper maintenance is the Safe Delivery of Newborns Law, MCL 712.1 *et seq*. Here, there was no question that respondent was able to provide some necessary and proper care to DVL, including shelter, food, and clothing. Respondent's disagreement with a psychiatrist's determination that DVL could return home was not relevant to whether the trial court should have exercised jurisdiction over DVL under MCL 712A.2(b). Justice ZAHRA also disagreed that declaring DVL "homeless" was an acceptable way for the court to take jurisdiction over him. Although respondent did not want to be labeled an unfit parent, a parent who causes

their child to become homeless has abandoned or neglected the child.  Allowing a parent to dictate the scope and extent of a treatment plan was not supported by the statute.

Justice THOMAS did not participate because the Court considered this case before she assumed office.

# OPINION

Chief Justice:
Elizabeth T. Clement

Justices:
Brian K. Zahra
Richard H. Bernstein
Megan K. Cavanagh
Elizabeth M. Welch
Kyra H. Bolden
Kimberly A. Thomas

FILED April 14, 2025

S T A T E   O F   M I C H I G A N

SUPREME COURT

*In re* D. V. LANGE, Minor.

No. 166509

BEFORE THE ENTIRE BENCH (except THOMAS, J.)

CLEMENT, C.J.

The issue presented in this case is whether the Court of Appeals properly reversed the trial court's holding that neither MCL 712A.2(b)(1) nor (2) provides a basis for jurisdiction over DVL, a juvenile. Because we believe that the trial court did not clearly err by finding no basis for jurisdiction, we reverse the Court of Appeals judgment and remand to the trial court for proceedings not inconsistent with this opinion.

## I.  FACTS

DVL has been diagnosed with post-traumatic stress disorder, oppositional defiant disorder, attention deficit hyperactivity disorder, and reactive attachment disorder. DVL

has repeatedly set fires in respondent-mother's home, attempted to injure the family pets, and demonstrated inappropriate sexual behaviors. He has also threatened to kill respondent, his siblings, and himself. He has been hospitalized several times for mental health treatment. In November 2020, respondent enrolled DVL in a year-long out-of-state treatment program, but after only six months, DVL was discharged for inappropriate sexual behavior and returned to Michigan.

In June 2021, when DVL again attempted to start a fire in the home and threatened suicide, respondent took him to St. John Hospital. DVL was held there while the Department of Health and Human Services (DHHS) searched for a suitable pediatric inpatient psychiatric program. On July 8, 2021, the hospital did not clear DVL for discharge. But oddly, on July 9, 2021, without having provided DVL with additional treatment, the hospital cleared DVL for discharge, recommending that DVL return home to receive intensive outpatient mental health services.[1] Respondent testified that "to hear that there was no help was . . . heartbreaking." She refused to pick DVL up from the hospital, explaining that she felt that bringing DVL home would pose a significant risk to himself, respondent's other children, their pets, and herself.

---

[1] It is difficult not to share the Court of Appeals' skepticism regarding how DVL could become dischargeable after one day without receiving additional treatment. See *In re Lange*, unpublished per curiam opinion of the Court of Appeals, issued November 2, 2023 (Docket No. 362365), p 5 n 4 ("How in the course of one day DVL could go from being nondischargeable to dischargeable from the hospital without receiving treatment casts doubt on whether the hospital chose to wash its hands of this troubled youth rather than keep him in a holding pattern while DHHS tried but failed to find a suitable placement for him.").

DHHS consequently filed a petition to take jurisdiction over DVL based on MCL 712A.2(b)(1) and (2). MCL 712A.2(b)(1) explains that the court has jurisdiction over a juvenile

> [w]hose parent . . . , when able to do so, neglects or refuses to provide proper or necessary support, education, medical, surgical, or other care necessary for his or her health or morals, who is subject to a substantial risk of harm to his or her mental well-being, who is abandoned by his or her parents, . . . or who is without proper custody or guardianship.

MCL 712A.2(b)(2) provides jurisdiction over a juvenile "[w]hose home or environment, by reason of neglect, cruelty, drunkenness, criminality, or depravity on the part of a parent, . . . is an unfit place for the juvenile to live in."

After conducting several hearings on the matter, the trial court denied the petitions to take jurisdiction over DVL under MCL 712A.2(b)(1) or (2). Commenting that it had never presided over a case like this, the court said, "I just don't see how I can find that [respondent has] been neglectful or abusive . . . ." The court noted that DVL "has a very severe detachment disorder" that "causes him to act out in very dangerous ways," and although respondent "has made numerous efforts to try to have [DVL's] condition addressed," respondent has "two other children who would be at risk if [respondent] brought [DVL] home . . . ." The court, the assistant attorney general, the lawyer guardian ad litem, and respondent's attorney recognized nevertheless that if the petition were not authorized, DVL's situation would remain unchanged—he would still need to be picked up from his current placement, and if respondent again refused to pick him up, DHHS would file another petition, thus beginning the Kafkaesque cycle over again. Respondent acknowledged that it was a "no win situation." The court noted that

3

> [t]he department can review and decide whether, under the circumstances and based on my comments, whether it might be appropriate to think about filing a dependency petition . . . other than that, I haven't heard anything has changed; that it's any safer for [respondent] to bring [DVL] home now than it was ten months ago or whatever the time frame is. . . . You know, if [respondent] doesn't come and pick [DVL] up, you know, Foster Care can't do it. You're right. I'm not disputing that. I'm just, you know, saying that under these circumstances, I just, I just can't justify a finding that [respondent] has been neglectful of some sort.

Thus, the court determined that a preponderance of the evidence did not support jurisdiction under MCL 712A.2(b)(1) or MCL 712A.2(b)(2) and dismissed DHHS's petition.

DHHS appealed, and the Court of Appeals reversed in a split, unpublished per curiam decision. The majority reversed the trial court's holdings regarding both MCL 712A.2(b)(1) and (2), opining that both subsections provided adequate bases for jurisdiction. *In re Lange*, unpublished per curiam opinion of the Court of Appeals, issued November 2, 2023 (Docket No. 362365). Relying on *In re Hockett*, 339 Mich App 250; 981 NW2d 534 (2021), the Court of Appeals majority first concluded that the trial court clearly erred by holding that Subsection (b)(2) did not apply. *In re Lange*, unpub op at 3-4. The majority noted that "despite her efforts, respondent admitted that she could not care for DVL's special and significant mental health needs. She testified that DVL and her other two children would be at risk of harm if DVL were in the home." *Id*. at 5. Respondent had refused DHHS's assistance in securing outpatient treatment. Of course, respondent had attempted such outpatient therapy for years without success, the majority recognized. However, the majority held that a preponderance of the evidence showed "that respondent's actions rendered the home environment a place of danger for DVL, as well as respondent's other two children and, thus, statutorily unfit." *Id*. Thus, the Court of

4

Appeals concluded that the trial court had clearly erred by failing to take jurisdiction under MCL 712A.2(b)(2).

Regarding Subsection (b)(1), the Court of Appeals relied on *Hockett*. In both *Hockett* and this case, the respondent-mothers refused to seek outpatient treatment but were generally willing to obtain inpatient mental health services. *In re Lange*, unpub op at 5. The majority conceded that it was unsafe for DVL to return home. *Id*. In fact, the majority also observed that while DHHS had considered a Community Mental Health (CMH) referral to provide outpatient treatment once a week, there was no evidence that such a program would be sufficient to care for DVL. *Id*. at 6 n 6. After referring to the trial court record, the majority nevertheless concluded that the trial court had clearly erred by failing to take jurisdiction under MCL 712A.2(b)(1), stating:

> A preponderance of the evidence supports a finding that, despite recommendations made by an examining adult (not pediatric) psychiatrist, respondent, although able to do so, refused to pick him up from the hospital and failed to secure intensive outpatient treatment for her son. This was sufficient testimony to establish by a preponderance of the evidence that respondent refused to provide proper or necessary care for DVL, who was subject to a substantial risk of harm to his mental well-being. [*In re Lange*, unpub op at 6-7.]

Thus, whereas the trial court found that neither Subsection (b)(1) nor Subsection (b)(2) provided a basis for jurisdiction, the Court of Appeals held that both subsections did.

Judge REDFORD dissented, concluding that he would have affirmed the trial court's decision not to take jurisdiction. He said:

> There is no indication that DVL's mother did anything other than undertake exhaustive, comprehensive, and costly measures to try and care for DVL. Her refusal to allow DVL to be placed in her home with two other minor children who would be endangered was not an act of neglect, cruelty, drunkenness, criminality, or depravity. Nor was there evidence that she was

5

able, despite her repeated and substantial efforts, to provide DVL with the proper or necessary support in her home. [*Id*. (REDFORD, J., dissenting) at 3.]

Respondent sought leave to appeal in this Court. We ordered oral argument concerning whether

(1) the Court of Appeals correctly found that the trial court should have assumed jurisdiction over the minor child pursuant to MCL 712A.2(b)(1) and (2) under the circumstances of this case; (2) *In re Hockett*, 339 Mich App 250 (2021), was correctly decided; and (3) DVL would qualify as a dependent homeless minor pursuant to MCL 712A.2(b)(3)(A). [*In re Lange*, 513 Mich 1032, 1032 (2024).]

## II. ANALYSIS

This Court "review[s] the trial court's decision to exercise jurisdiction for clear error in light of the court's findings of fact." *In re BZ*, 264 Mich App 286, 295; 690 NW2d 505 (2004) (citation omitted). A finding of fact is clearly erroneous when this Court is "left with a definite and firm conviction that a mistake has been made." *In re Schadler*, 315 Mich App 406, 408; 890 NW2d 676 (2016) (quotation marks and citation omitted). Questions of statutory interpretation are reviewed de novo. *In re LaFrance*, 306 Mich App 713, 723; 858 NW2d 143 (2014).

Child protective proceedings are generally divided into two phases: the adjudicative phase, which determines whether the court can take jurisdiction over a juvenile, and the dispositional phase, which determines what action will be taken on behalf of the juvenile. *In re Brock*, 442 Mich 101, 108; 499 NW2d 752 (1993). This case implicates the adjudicative phase. The trial court may exercise jurisdiction over the juvenile if a preponderance of the evidence demonstrates that one of the bases for jurisdiction set out in MCL 712A.2(b) applies. See *In re AMAC*, 269 Mich App 533, 536; 711 NW2d 426 (2006).

6

At issue in this case is whether there was jurisdiction under MCL 712A.2(b)(1) and (2). Those subsections provide, in relevant part, that a court has

> (b) [j]urisdiction in proceedings concerning a juvenile under 18 years of age found within the county:
>
> (1) Whose parent or other person legally responsible for the care and maintenance of the juvenile, *when able to do so*, neglects or refuses to provide proper or necessary support, education, medical, surgical, or other care necessary for his or her health or morals, who is subject to a substantial risk of harm to his or her mental well-being, who is abandoned by his or her parents, guardian, or other custodian, or who is without proper custody or guardianship. As used in this sub-subdivision:
>
> \* \* \*
>
> *(B) "Neglect" means that term as defined in section 2 of the child abuse and neglect prevention act, 1982 PA 250, MCL 722.602.*
>
> \* \* \*
>
> (2) Whose home or environment, *by reason of neglect*, cruelty, drunkenness, criminality, or depravity on the part of a parent, guardian, nonparent adult, or other custodian, is an unfit place for the juvenile to live in. As used in this sub-subdivision, *"neglect" means that term as defined in section 2 of the child abuse and neglect prevention act, 1982 PA 250, MCL 722.602.* [Emphasis added.]

Both Subsection (1) and Subsection (2) incorporate the definition of "neglect" from MCL 722.602. MCL 722.602(1)(d) defines "neglect" as

> harm to a child's health or welfare by a person responsible for the child's health or welfare that occurs through negligent treatment, including the failure to provide adequate food, clothing, shelter, or medical care, though financially able to do so, or the failure to seek financial or other reasonable means to provide adequate food, clothing, shelter, or medical care.

## A. MCL 712A.2(b)(1)

Subsection (b)(1) applies to a child "[w]hose parent . . . , when able to do so, neglects or refuses to provide proper or necessary support[.]" We assume that by refusing to take DVL home and having him live there while receiving outpatient treatment, respondent failed to provide proper or necessary support. But the question is whether she refused to provide such support "when able to do so."

" 'Unless statutorily defined, every word or phrase of a statute should be accorded its plain and ordinary meaning, taking into account the context in which the words are used.' " *Spectrum Health Hosps v Farm Bureau Mut Ins Co of Mich*, 492 Mich 503, 515; 821 NW2d 117 (2012) (citation omitted). MCL 712A.2 does not define "when able to do so." Therefore, we turn to the dictionary to discern the meaning of "when able to do so." See *People v Feeley*, 499 Mich 429, 437; 885 NW2d 223 (2016) (explaining that it is appropriate to consult dictionary definitions to determine the plain and ordinary meaning of a word when a statute leaves that word undefined).

"Able" is defined as: (1) "having sufficient power, skill, or resources to do something"; (2) "having the freedom or opportunity to do something"; or (3) "having a quality or nature that makes something possible[.]" *Merriam-Webster's Collegiate Dictionary* (11th ed). We believe that the first definition is the most contextually appropriate. The third definition would require courts to undergo a strangely ontological analysis of a parent's nature. The second definition perhaps overlaps with the first, as having the "opportunity" to do something arguably requires having sufficient power, skill, or resources to do something. Insofar as the second definition suggests that only a technical liberty to do something is sufficient to be considered "able" to do it, we do not believe that

8

the definition is contextually appropriate. In a practical sense, to be "able" to do something, someone must have both the technical freedom to do it and the resources to make it possible. We doubt that the Legislature would consider a parent "able" to provide necessary care or support if, though free to provide such care or support, they did not have the resources to do so.[2] See also *In re Hockett*, 339 Mich App at 255 (recognizing that MCL 712A.2(b)(1) "implies some understanding of the existence of parents who do not have the resources to provide for their children"). We therefore hold that "able to do so" as used MCL 712A.2(b)(1) means that a parent must have "sufficient power, skill, or resources" to provide necessary care or necessary support.

Respondent, while perhaps physically able to bring DVL home, reasonably concluded that DVL could not live in the home without putting DVL, her other children, and herself in harm's way. In other words, respondent did not have sufficient power, skill, or resources to have DVL return and stay at home because he posed a danger to the other members of the household, as well as himself. Even had respondent worked with DHHS to obtain outpatient services, those services had failed in the past, and there was no

---

[2] As Justice CAVANAGH explained in her concurring statement in *In re Holbrook*, 513 Mich 898, 901 (2023) (CAVANAGH, J., concurring),

> I believe that the phrase ["when able to do so"] should be understood more broadly under a plain-language reading. . . . [R]espondent did not have the resources to care for the child's extensive medical needs. Looking at whether the parent . . . physically had the capacity to pick up her child, or whether respondent physically had the capacity to complete CMH paperwork, misses the point. . . . [O]ther barriers prevented respondent from being able to take [the child] home, notably, the risk of danger to the family and the recommendation by health professionals that appropriate treatment included 24/7 monitoring. How can it be said that respondent was "able to" provide proper care?

indication that such services would provide respondent with sufficient power, skill, or resources to enable DVL to live at home safely, especially given that DVL did not receive treatment during his most recent hospital stay. Consequently, respondent was not truly "able" to bring DVL home and thus provide proper or necessary support for him. The trial court therefore did not clearly err by refusing to take jurisdiction under MCL 712A.2(b)(1).

### B. MCL 712A.2(b)(2)

Subsection (b)(2) allows a court to take jurisdiction over a child "[w]hose home or environment, by reason of neglect . . . on the part of a parent, . . . is an unfit place for the juvenile to live in." Again, MCL 722.602(1)(d) defines "neglect" as "harm to a child's health or welfare by a person responsible for the child's health or welfare that occurs through negligent treatment, including the failure to provide adequate food, clothing, shelter, or medical care, though financially able to do so, or the failure to seek financial or other reasonable means to provide adequate food, clothing, shelter, or medical care."[3]

---

[3] We have held that Subsection (b)(2), unlike Subsection (b)(1), does not require a finding of culpable neglect. See also *In re Jacobs*, 433 Mich 24, 41; 444 NW2d 789 (1989) ("[W]e hold that culpability is not a prerequisite for probate court intervention under [MCL 712A.]2(b)(2)."). See also *id*. at 33-34 ("Subsection 2(b)(2) . . . uses 'neglect' as a noun and speaks to the objective condition of the home. Jurisdiction may be conferred under this subsection if the home is *in fact* an unfit place for the child to live. This subsection, by its own terms, mandates an inquiry into the objective state of being neglected rather than an examination of the individual causes or reasons for the neglect."). However, *Jacobs* looked to dictionary definitions of "neglect" because at the time, MCL 712A.2 did not define "neglect." *Id*. at 34. In a subsequent amendment, 2018 PA 58, the Legislature added language to MCL 712A.2 incorporating the definition of "neglect" from MCL 722.602(1)(d). As demonstrated by Justice ZAHRA's and Justice BERNSTEIN's opinions, there is disagreement over the effect of the amendments—Justice ZAHRA posits that currently, neither Subsection (b)(1) nor Subsection (b)(2) involves a determination of culpability. *Post* at 7 (ZAHRA, J., dissenting) ("However, our Legislature later expressly defined 'neglect' in *both* MCL 712A.2(b)(1) and (2). The term "neglect" as currently defined in both MCL 712A.2(b)(1) and (2) no longer has an element of culpability because

10

MCL 712A.2(b)(2) requires a home to be unfit by reason of a parent's "neglect." In order for there to be "neglect" as defined in MCL 722.602(1)(d), there must be "negligent treatment." That term is not defined by the statute, which only states that "negligent treatment" includes "the failure to provide adequate food, clothing, shelter, or medical care, though financially able to do so, or the failure to seek financial or other reasonable means to provide adequate food, clothing, shelter, or medical care." MCL 722.602(1)(d). See Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* (St. Paul: Thomson/West, 2012), p 132 ("The verb *to include* introduces examples, not an exhaustive list."). These examples do not fit the instant situation because respondent did at least seek other reasonable means to provide shelter or medical care, as she has consistently tried to obtain inpatient treatment for DVL.[4] Consequently, we must ask whether respondent has caused

it is not defined to include a *mens rea* requirement.") (citation omitted). Justice BERNSTEIN posits to the contrary that now both subsections have an element of culpability. *Post* at 11 (BERNSTEIN, J., concurring in part and dissenting in part) ("I would hold that when the Legislature chose to statutorily define the term 'neglect,' it implemented a culpability requirement in *both* MCL 712A.2(b)(1) and (b)(2)."). We did not request briefing on the effect of 2018 PA 58 or whether we should overrule *Jacobs*. Thus, we do not decide whether *Jacobs* remains good law despite the amendments of the statute. Instead, we ground our analysis in the current text of MCL 712A.2(b)(2), which now includes the definition of "neglect" in MCL 722.602(1)(d).

[4] Justice ZAHRA's dissenting opinion contends that respondent did fail to "provide adequate food, clothing, shelter, or medical care, though financially able to do so," and that thus, Subsection (b)(2) applies. I am dubious. Here, respondent at least sought "other reasonable means" to provide adequate food, clothing, shelter, or medical care. MCL 722.602(1)(d). I believe that is enough to conclude that there was no negligent treatment or, by extension, neglect. Presumably, the "other reasonable means" clause would only apply to a respondent who has not succeeded in providing adequate food, clothing, shelter, or medical care, though financially able to do so. In other words, I read the statute as stating that if a respondent has provided adequate food, clothing, shelter, and medical care, there is no negligent treatment; if a respondent has failed to provide those things though financially able to do so, then we ask whether they have sought "financial or other reasonable means"

11

harm to DVL through her "negligent treatment." Because the examples of negligent treatment given earlier do not provide a comprehensive definition, we again turn to the dictionary to define the term.

"An undefined statutory term must be accorded its plain and ordinary meaning. A lay dictionary may be consulted to define a common word or phrase that lacks a unique legal meaning. A legal term of art, however, must be construed in accordance with its peculiar and appropriate legal meaning." *Brackett v Focus Hope, Inc*, 482 Mich 269, 276; 753 NW2d 207 (2008) (citations omitted). "Negligence" is a legal term of art as it relates to a cause of action for negligence in tort. *Maki v East Tawas*, 385 Mich 151, 158; 188 NW2d 593 (1971) (" 'Negligence' and 'tort' remain legal terms of art . . . ."). It is not certain, though, whether the Legislature intended to invoke that technical definition by its use of "negligent," given that "negligent" is also a common word.

In this case, we need not determine whether "negligent" as used in "negligent treatment" is used per its common or legal definition because both the lay dictionary and the legal dictionary we consulted contain the same definition. See *Brackett*, 482 Mich at 276 (explaining that the Court did not need to decide whether the statutory phrase was "a common phrase or a legal term of art because the terms in the phrase are similarly defined

of providing them. Only if the respondent's actions fit under neither clause is there negligent treatment under the statute.

In any case, given Justice ZAHRA's contention that Subsection (b)(1) applies because respondent neglected to provide proper or necessary support by failing to take DVL home, it is strange that that he argues that Subsection (b)(2) also applies. That subsection requires a finding that the "home . . . [was] an unfit place for [DVL] to live in." There is a tension in asserting that respondent should have taken DVL home to avoid the application of Subsection (b)(1) but also that the home was unfit.

12

in both a lay dictionary and a legal dictionary"). *Black's Law Dictionary* (12th ed) defines "negligent" as "[c]haracterized by a person's failure to exercise the degree of care that someone of ordinary prudence would have exercised in the same circumstance." *Merriam-Webster* defines "negligent," in relevant part, as "marked by or given to neglect especially habitually or culpably" or "failing to exercise the care expected of a reasonably prudent person in like circumstances[.]" *Merriam-Webster's Collegiate Dictionary* (11th ed). Both legal and lay dictionaries provide similar definitions of "negligent." The second definition from *Merriam-Webster*, which is essentially the same as the *Black's* definition, squarely fits the context here. Thus, we define "negligent" for purposes of MCL 722.602(1)(d) as failing to exercise the care expected of a reasonably prudent person in like circumstances.

Respondent's treatment of DVL does not meet this definition of "negligent." Respondent has been trying to get DVL the treatment he needs, as any reasonably prudent person in her circumstance would have. Refusing to take DVL home under the circumstances was precisely what an ordinarily and reasonably prudent person would do, given that DVL posed a danger to himself and others if taken home. Past experience indicated that even if DVL were provided outpatient treatment, he would still pose a danger to the household. Because respondent did not engage in "negligent treatment," and therefore did not commit "neglect" as that term is defined by MCL 722.602(1)(d), the trial court did not clearly err by refusing to take jurisdiction under MCL 712A.2(b)(2).[5]

---

[5] Justice ZAHRA's dissenting opinion implies that we have elevated a respondent's "subjective perspective of risk" to a decisive factor in our statutory analysis. *Post* at 3 ("A respondent's subjective perspective of risk and lack of culpability are not relevant to the statutory objective of a trial court assuming jurisdiction over a child under the Child Abuse and Neglect Prevention Act (CANPA), MCL 722.601 *et seq*."). That is not the case. Per our textual analysis, when determining whether Subsection (b)(1) is a basis for jurisdiction,

Additionally, we note again that the Court of Appeals majority here looked to *In re Hockett*, 339 Mich App 250, reasoning that that case is analogous and its rationale supported a reversal here. *In re Lange*, unpub op at 4-7. While we agree that the facts of the two cases are similar, we point out that there is a deferential standard of review, namely, clear error. *Hockett* affirmed a trial court decision, whereas here the Court of Appeals majority reversed the trial court. While the Court of Appeals was certainly right to look to *Hockett*, it should have remained mindful of the deference owed to the trial court's decision.[6]

### III. CONCLUSION

We hold that the trial court did not clearly err by declining to take jurisdiction under MCL 712A.2(b)(1) and (2). Therefore, we reverse the Court of Appeals judgment and remand to the trial court for reinstatement of the trial court's order denying DHHS's petition

---

a court should ask whether a respondent has "sufficient power, skill, or resources" to provide necessary care or support, in accordance with the statute's requirement that a parent to be "able" to provide such care or support. That is an objective standard and does not turn on a parent's subjective view of their ability. When determining whether Subsection (b)(2) is a basis for jurisdiction, a court should ask whether the respondent failed to exercise the care expected of a reasonably prudent person in like circumstances as required under the definition of "negligent treatment" and ultimately "neglect." Again, that is an objective standard. In other words, this opinion requires lower courts to apply the statutory text based on objective definitions. It does not allow respondents to evade a finding of jurisdiction based on their subjective views or render professional medical and psychiatric recommendations of no significance.

[6] What Justice ZAHRA refers to as "improperly indulg[ing]" respondent, *post* at 10, I believe is a proper deference to trial court findings.

Other statutes that the dissenting opinion seems to claim that respondent violated, such as MCL 750.161, are beside the point. No charges have been filed against respondent on that ground, and DHHS has raised no argument based on that statute.

14

and for proceedings not inconsistent with this opinion.  This decision is without prejudice to DHHS to seek jurisdiction under other statutory grounds by filing a subsequent petition.[7]

Elizabeth T. Clement
Megan K. Cavanagh
Elizabeth M. Welch
Kyra H. Bolden

---

[7] We note that MCL 712A.2(b)(3) may provide an adequate basis for jurisdiction in cases such as this.  MCL 712A.2(b) allows a court to take jurisdiction over a juvenile

> (3) If the juvenile is dependent and is in danger of substantial physical or psychological harm.  The juvenile may be found to be dependent when any of the following occurs:

> (A) The juvenile is homeless or not domiciled with a parent or other legally responsible person.

Here, when the hospital had discharged DVL and respondent refused to take him to her house, DVL was arguably homeless, given that he had no permanent place of residence at that time.  See *Merriam-Webster's Collegiate Dictionary* (11th ed) (defining "homeless" as "having no home or permanent place of residence").  The statute puts forward no minimum time requirement for a juvenile to be found homeless.  DVL was also seemingly "in danger of substantial physical or psychological harm," given his mental health struggles.  We leave it to DHHS's discretion whether they wish to file a petition seeking jurisdiction under MCL 712A.2(b)(3)(A).  If DHHS should choose to file a petition, we note that the facts in this case have of course changed since the filing of the original petition, and the trial court's determination on a new petition would have to consider the current facts.  *In re MU*, 264 Mich App 270, 278-279; 690 NW2d 495 (2004) ("The statute [MCL 712A.2(b)(1) and (2)] speaks in the present tense, and, therefore, the trial court must examine the child's situation at the time the petition was filed.").

We note that Justice ZAHRA claims that we are remanding this case for the trial court to address whether Subsection (b)(3) applies.  Justice BERNSTEIN claims that we are "vaguely expand[ing]" Subsection (b)(3).  We do neither.  DHHS can choose to seek jurisdiction under Subsection (b)(3) or not.  As Justice ZAHRA notes, given DVL's current age, DHHS may not wish to claim that he is "dependent."  If DHHS does seek jurisdiction under that subsection, the trial court can make its own determination regarding whether the subsection applies.

15

# STATE OF MICHIGAN

## SUPREME COURT

*In re* D. V. LANGE, Minor,

No. 166509

_____

CAVANAGH, J. (*concurring*).

I concur with the majority opinion. The trial court did not clearly err by declining to exercise jurisdiction pursuant to MCL 712A.2(b)(1) or MCL 712A.2(b)(2). If DVL is still in need of services on remand, the Department of Health and Human Services (DHHS) may wish to seek the trial court's jurisdiction under MCL 712A.2(b)(3) and not simply "leave [DVL] at the nearest homeless center and hope for the best," which DHHS characterizes as its only option in its brief on appeal. Whether jurisdiction will be appropriate under MCL 712A.2(b)(3) or some other provision will be up to the trial court to decide under the circumstances as they exist at the time a petition is filed.[1]

I write separately in another attempt to draw the Legislature's attention to this ongoing problem—that is, instances where DHHS seeks jurisdiction over an otherwise fit parent because the parent is unable to adequately care for a child with severe mental health

_____

[1] The majority opinion notes that DHHS may elect to file a petition under MCL 712A.2(b)(3) if it deems it appropriate. The majority does not order DHHS to file such a petition, does not define "homeless" under MCL 712A.2(b)(3), nor does it determine whether DVL's situation would come under that definition. The majority simply acknowledges that the Court directed briefing as to whether DVL would qualify as "dependent" under Subsection (b)(3). We received briefing both in support of and against this proposition, and the majority opinion takes no position on the matter because to do so would be premature at this juncture.

issues, like the respondent-mother in this case. See *In re Holbrook*, 513 Mich 898, 899 (2023) (CAVANAGH, J., concurring). Although I agree with the majority that there is no clear error in the trial court's decision not to exercise jurisdiction, the facts of this case continue to demonstrate why the "available grounds for jurisdiction are ill-equipped to address situations" involving children with serious mental health diagnoses. *Id*. at 902. Parents who have gone to great lengths to help their mentally ill children but who ultimately exhaust the resources at their disposal should not suffer additional legal and collateral consequences. On the other hand, children in crisis should not go without adequate resources, nor should DHHS be compelled to file petitions alleging unfitness where none exists just so that the agency is able to provide services. There must be a better solution. Once again, "I ask the Legislature to consider creating a no-fault procedure that allows the state to intervene without requiring courts to adjudicate parents as unfit when they are struggling to support children with complex mental health needs." *Id*. at 903. Reform is needed, or parents and children will continue to suffer.

Megan K. Cavanagh

S T A T E   O F   M I C H I G A N

SUPREME COURT

*In re* D. V. LANGE, Minor.

No. 166509

_____

BERNSTEIN, J. (*concurring in part and dissenting in part*).

I concur with the majority's recitation of the facts and its analysis to the extent it holds that the trial court did not abuse its discretion by ruling that jurisdiction was not properly asserted under either MCL 712A.2(b)(1) or (b)(2). I believe that both statutory provisions require a showing of culpability on the part of a parent before a court can exercise jurisdiction over a child, and I do not believe that respondent acted in a culpable manner. However, I write separately because I believe that the majority's analysis of culpability with respect to MCL 712A.2(b)(2) is insufficient, and to the extent that the majority suggests that MCL 712A.2(b)(3) "may" provide an adequate basis to obtain jurisdiction over DVL, I disagree.

## I. MCL 712A.2(b)(1), (b)(2), AND CULPABILITY

To support its conclusion that jurisdiction over DVL was not properly asserted under MCL 712A.2(b)(1) or (b)(2), the majority concludes that respondent here did not commit neglect or act in a negligent manner. I agree. The record clearly demonstrates that DVL required constant complex care, which respondent was not able to provide. Respondent was actively seeking alternative care that could meet DVL's complex needs. It would be counterintuitive to characterize these actions as neglectful or negligent.

But the majority opinion stops short of concluding that MCL 712A.2(b)(1) and (b)(2) each require a finding of culpable conduct on the part of the parent.[1] I believe such a finding is central to an exercise of jurisdiction under either of these provisions.

To begin, each statutory provision provides for jurisdiction, in part, on the basis of parental neglect. In this context, the Legislature has chosen to define "neglect" as

> harm to a child's health or welfare by a person responsible for the child's health or welfare that occurs through negligent treatment, including the failure to provide adequate food, clothing, shelter, or medical care, though financially able to do so, or the failure to seek financial or other reasonable means to provide adequate food, clothing, shelter, or medical care. [MCL 722.602(1)(d).]

MCL 712A.2(b)(1) provides a court with jurisdiction over a minor

> [w]hose parent or other person legally responsible for the care and maintenance of the juvenile, when able to do so, neglects or refuses to provide proper or necessary support, education, medical, surgical, or other care necessary for his or her health or morals, who is subject to a substantial risk of harm to his or her mental well-being, who is abandoned by his or her parents, guardian, or other custodian, or who is without proper custody or guardianship.

As this Court has previously said, an exercise of jurisdiction on this basis necessarily requires culpability on the part of the parent. See *In re Jacobs*, 433 Mich 24, 33; 444 NW2d 789 (1989) ("According [to MCL 712A.2(b)(1)], jurisdiction may be conferred upon the probate court if a parent, 'when able to do so,' neglects or refuses to provide

---

[1] I note that I do not believe that culpable conduct requires intentional *mens rea*. Instead, culpable conduct refers merely to a person's blameworthiness. See Merriam-Webster.com Dictionary <https://www.merriam-webster.com/dictionary/culpable> (defining "culpable" as "meriting condemnation or blame especially as wrong or harmful") (accessed March 4, 2025) [https://www.perma.cc/MZ6X-YVLZ]. In this way, even a parent's negligence is blameworthy and, therefore, amounts to culpable conduct.

2

necessary support or care. This subsection, which uses 'neglect' as a verb, is subjective on its face. By inserting 'when able to do so,' the Legislature has created a 'built-in' culpability requirement.").

Nothing in the majority opinion today changes this conclusion. The problem lies with the majority opinion's approach to MCL 712A.2(b)(2). MCL 712A.2(b)(2) allows a court to take jurisdiction over a child "[w]hose home or environment, by reason of neglect . . . on the part of a parent, . . . is an unfit place for the juvenile to live in." In determining whether the child's home is unfit by reason of neglect, and by defining neglect as a failure on the part of a parent to properly provide for the child, see MCL 722.602(1)(d), this provision necessarily instructs courts to look to whether the parent has made the home unfit. In other words, like MCL 712A.2(b)(1), this provision also asks courts to make a finding that a parent has acted in a culpable manner. However, *Jacobs* previously held that MCL 712A.2(b)(2) allows for a finding of jurisdiction "if the home is *in fact* an unfit place for the child to live. [MCL 712A.2(b)(2)], by its own terms, mandates an inquiry into the objective state of being neglected rather than an examination of the individual causes or reasons for the neglect." *Jacobs*, 433 Mich at 33-34. Ultimately, *Jacobs* held that "culpability is not a prerequisite" for a finding of jurisdiction pursuant to MCL 712A.2(b)(2). *Id*. at 41.

I believe that, as it relates to culpability under MCL 712A.2(b)(2), *Jacobs*'s holding is no longer good law. As the majority correctly acknowledges, at the time that *Jacobs* was decided, the Legislature had not yet defined neglect. By now defining neglect in terms of whether a parent has failed to provide adequate support, the Legislature has necessarily disagreed with *Jacobs* about the application of MCL 712A.2(b)(2) and found that parental

3

culpability is a prerequisite to the court's exercising jurisdiction, as it is with MCL 712A.2(b)(1).[2]

The majority concludes that the use of the term "neglect" in MCL 712A.2(b)(2) requires courts to look to whether a parent has exercised proper care over the child. However, the majority fails to address the tension between its own analysis and the *Jacobs* holding to the contrary, instead stating, "[W]e do not decide whether *Jacobs* remains good law despite the amendments of the statute." I do not believe that the majority opinion and *Jacobs* can be reconciled, and by failing to address this conflict, I believe that the majority's approach fails to provide adequate guidance to courts applying MCL 712A.2(b)(2). Indeed, the Court of Appeals has continued to rely upon *Jacobs* for its assertion that MCL 712A.2(b)(2) does not require an inquiry into a parent's culpability. See *In re Hockett*, 339 Mich App 250, 256; 981 NW2d 534 (2021) (relying on *Jacobs* for the proposition that culpability is not a prerequisite for a finding of jurisdiction under MCL 712A.2(b)(2) and that a parent's inability to care for a child's needs can support a finding of jurisdiction under MCL 712A.2(b)(2)); *In re Holbrook*, unpublished per curiam opinion of the Court of Appeals, issued May 19, 2022 (Docket No. 359504), pp 4-5 (relying on *Jacobs* and

---

[2] I note that the Legislature previously required that any parent who committed neglect be placed on a central registry. See MCL 722.627j, as amended by 2010 PA 81. There would have been little sense for a parent to be placed on a registry if the Legislature did not believe that committing neglect, a finding required by both MCL 712A.2(b)(1) and (b)(2), did not necessarily include a finding of parental culpability. However, this provision was amended in 2022. See 2022 PA 64. MCL 722.627j now requires a parent to be placed on the registry if the parent has committed "*serious* abuse or neglect." (Emphasis added.) This Court has not addressed whether there is a difference between neglect as used in MCL 712A.2(b)(1) and (b)(2) and neglect or serious neglect as used in MCL 722.627j(2). In any event, I believe that by characterizing neglect as something that could require a parent to be placed on a central registry, the Legislature has acknowledged that neglect necessarily includes some level of parental culpability.

4

*Hockett* to explain that though the respondent could not manage her child's complex needs, culpability was not a prerequisite under MCL 712A.2(b)(1)); *In re Lange*, unpublished per curiam opinion of the Court of Appeals, issued November 2, 2023 (Docket No. 362365) (relying on *Jacobs* and *Hockett* for the proposition that culpability is not a prerequisite under MCL 712A.2(b)(2)).  The majority opinion leaves unclear how and when courts can rely on *Jacobs* in the future.

I do not see a principled manner in which the majority can issue an opinion that states that MCL 712A.2(b)(2) requires courts to look to a parent's negligence, i.e., whether the parent has acted in a culpable manner, and simultaneously refuse to address an opinion which says that culpable behavior is irrelevant to an inquiry under MCL 712A.2(b)(2). Instead, I believe that MCL 712A.2(b)(1) and (b)(2) each require a finding of culpable conduct on the part of the parent, and to the extent that *Jacobs* has held otherwise, I would hold that *Jacobs* has been negated by legislative amendment.

## II.  MCL 712A.2(b)(3)

When a child requires services and a parent cannot provide that child the requisite care through no fault of their own, the question remains whether MCL 712A.2 provides some other basis for the Department of Health and Human Services (DHHS) to seek a court's exercise of jurisdiction over the child.  Although the petitioner never filed a petition seeking jurisdiction on the basis of MCL 712A.2(b)(3), this Court nonetheless ordered oral argument asking whether that provision could serve as a basis for jurisdiction.  Today, the majority suggests that MCL 712A.2(b)(3) may provide such a basis.  Specifically, MCL 712A.2(b)(3)(A) allows a court to exercise jurisdiction over a child if that child is

5

dependent and is in danger of substantial physical or psychological harm. Of particular relevance here, a juvenile may be found to be dependent if they are homeless.[3]

I disagree with the majority's assertion that this provision may provide a basis for jurisdiction here. To begin, I have no qualms with the majority's explanation of the record; it is true that the family home did not adequately meet DVL's needs. According to the record, DVL required constant monitoring and care and engaged in violent behavior. The home was not a safe place for DVL or the other residents. But there is no basis to hold that these circumstances rendered DVL homeless under MCL 712A.2(b)(3)(A).

Respondent has provided this Court with state and federal statutes that define a person as homeless if their home is not adequate for their needs. See 42 USC 11302(a)(1) of the McKinney-Vento Homeless Assistance Act, 42 USC 11301 *et seq.* (defining the terms "homeless" and "homeless person," in part, as "an individual or family who lacks a fixed, regular, and adequate nighttime residence"); MCL 388.1763a(2) of the State School Aid Act, MCL 388.1601 *et seq.* (adopting the definition of "homeless" in 42 USC 11302(a)(1)); MCL 28.292(14)(g)(*i*), addressing state personal identification cards (adopting a definition of "homeless" that is used by the United States Department of

---

[3] MCL 712A.2(b)(3) also provides for a finding that the child is dependent if the child is not domiciled with a parent. I believe that DVL remained domiciled with respondent even though DVL did not return to the family home. See *Grange Ins Co of Mich v Lawrence*, 494 Mich 475, 503; 835 NW2d 363 (2013) (explaining that a "child's domicile is determined by reference to the domicile of his or her parents" and that a "child's domicile of origin remains the child's domicile until a new domicile is acquired through the actions of the child's parents or until that point in time when the minor, either through emancipation or by reaching the age of majority, can acquire a domicile of choice"). In any event, because respondent concedes that DVL remained domiciled with her and because the majority does not address domicile, I limit my analysis under MCL 712A.2(b)(3) to the question of homelessness.

6

Housing and Urban Development); MCL 333.2891(19)(a) of the Public Health Code, MCL 333.1101 *et seq*. (same). The problem with reliance on these authorities, however, is that "homeless" is specifically defined by these statutes for application within the relevant act. Though the statutory scheme here defines certain terms, such as "neglect," it does no such thing for the term "homeless." Indeed, the Michigan Legislature has chosen to incorporate specific definitions of the word "homeless" elsewhere, see MCL 388.1763a; MCL 28.292(14)(g)(*i*); MCL 333.2891(19)(a), but it has chosen not to do so here. Thus, there is no indication that the Legislature intended for "homeless," as it is used in MCL 712A.2(b)(3), to be read with a technical legal meaning. See MCL 8.3a ("All words and phrases shall be construed and understood according to the common and approved usage of the language; but technical words and phrases, and such as may have acquired a peculiar and appropriate meaning in the law, shall be construed and understood according to such peculiar and appropriate meaning.").

Instead, an undefined statutory term is to be given its "plain and ordinary" meaning. *People v Thompson*, 477 Mich 146, 151; 730 NW2d 708 (2007). "We consult a lay dictionary when defining common words or phrases that lack a unique legal meaning. This is because the common and approved usage of a nonlegal term is most likely to be found in a standard dictionary, not in a legal dictionary." *Id*. at 151-152 (citations omitted). See also *Spectrum Health Hosps v Farm Bureau Mut Ins Co of Mich*, 492 Mich 503, 515; 821 NW2d 117 (2012) (" 'Unless statutorily defined, every word or phrase of a statute should be accorded its plain and ordinary meaning, taking into account the context in which the words are used.' ") (citation omitted). Merriam-Webster defines "homeless" as "having no home or permanent place of residence." Merriam-Webster.com Dictionary, *homeless*

7

<https://www.merriam-webster.com/dictionary/homeless> (accessed March 4, 2025) [https://www.perma.cc/Z2ZH-MGPM]. In turn, "home" is defined as "one's place of residence." Merriam-Webster.com Dictionary, *home* <https://www.merriam-webster.com/dictionary/home> (accessed March 4, 2025) [https://www.perma.cc/ADX9-VKE7].[4]

These dictionary definitions lead me to conclude that "homeless," as it is used in MCL 712A.2(b)(3), merely refers to whether the child has a physical dwelling to return to. Here, DVL did have a physical dwelling he could return to. While respondent makes a facially attractive argument that a child should be considered homeless if that child's home cannot meet his basic needs, respondent cites unrelated federal and state statutes as support for her argument. This Court cannot import definitions from unrelated statutory schemes merely because we believe that those specialized definitions are a matter of good policy. Per our canons of statutory interpretation, we must first look to the dictionary definition of the word "homeless" to help parse its plain meaning. No dictionary definition supports respondent's argument that a child is effectively homeless if a child's home does not meet their needs, and respondent has likewise failed to provide any legislative history indicating that the Legislature intended that courts adopt this reading of "homeless."

---

[4] Similarly, Oxford Advanced Learner's Dictionary.com defines "homeless" as "having no home[.]" <https://www.oxfordlearnersdictionaries.com/us/definition/english/homeless?q=homeless> (accessed March 6, 2025) [https://www.perma.cc/2VN3-9GUB]. In turn, "home" is simply defined as "house, etc." Oxford Advanced Learner's Dictionary.com, *home* <https://www.oxfordlearnersdictionaries.com/us/definition/english/home_1?q=home> (accessed March 6, 2025) [https://www.perma.cc/V643-PPRN]. Collins Dictionary.com defines "homeless" as "having no home; without a permanent place of residence." Collins Dictionary.com, *homeless* <https://www.collinsdictionary.com/dictionary/english/homeless> (accessed March 4, 2025).

8

The majority also suggests that, because respondent refused to retrieve DVL when he was discharged from the hospital, DVL was "arguably homeless."[5]  However, such an argument flies face-first into the majority's conclusion that respondent did *not* act in a culpable manner.  Here, a team of medical professionals said that DVL could return home and receive outpatient therapy.[6]  The majority's focus on the fact that respondent *chose* not to retrieve DVL in its analysis under MCL 712A.2(b)(3) necessarily invites questions into respondent's culpability.  In other words, the majority opinion appears to be defining homelessness in terms of whether *respondent* has rendered the child homeless.  But, while MCL 712A.2(b)(1) and (b)(2) speak directly to a parent's actions, and thus invoke questions of parental culpability, MCL 712A.2(b)(3) does not.  Compare MCL 712A.2(b)(1) (providing a court with jurisdiction over a minor "[w]hose *parent* . . . , when able to do so, neglects or refuses to provide proper or necessary support") (emphasis added) and MCL 712A.2(b)(2) (providing a court with jurisdiction over a minor "[w]hose home or environment, by reason of neglect . . . on the part of a *parent* . . . is an unfit place for the juvenile to live in") (emphasis added) with MCL 712A.2(b)(3)(A) (stating that a juvenile

---

[5] I note that respondent did not raise this argument in her briefing.  Her briefing has only characterized the home as an unfit place for DVL's needs.

[6] I do not question respondent's testimony that she did not have the ability to adequately care for DVL in the home.  However, without any medical record evidence, I cannot share in my colleagues' skepticism surrounding DVL's discharge.  While I acknowledge that respondent felt incapable of caring for DVL in the home, at bottom, a team of medical professionals monitored DVL and concluded that DVL could return home and receive intensive outpatient therapy.  At this point in the litigation, I have no reason to believe that DVL's medical team acted in bad faith, and I would accept their conclusion moving forward.

9

may be found to be dependent if "[t]he juvenile is homeless or not domiciled with a parent or other legally responsible person").

Injecting parental culpability into an analysis under MCL 712A.2(b)(3) misinterprets the plain language of the provision and appears to directly conflict with the majority's earlier analysis finding that respondent was blameless under this set of circumstances. While there are certainly circumstances in which a parent can render a child homeless, such actions would likely result in a petition for jurisdiction on the basis of abandonment under MCL 712A.2(b)(1), not homelessness under MCL 712A.2(b)(3).

When we ordered oral argument on the application in this case, we asked the parties to brief whether MCL 712A.2(b)(3) was an appropriate basis for a finding of jurisdiction under circumstances like these. While the majority does not take a definitive stance on this question, having received such briefing, I would answer the question and hold that MCL 712A.2(b)(3) does *not* support a finding of jurisdiction in this circumstance.

I, like my colleagues, sympathize with parents who find themselves in respondent's position. It seems that the only way children with complex mental health crises can receive necessary help under the statute is if their parents or caregivers are adjudicated as neglectful, even when courts have found that these parents were willing to address the child's needs. In circumstances like these, the current statutory scheme thus results in a conundrum: either children who require services will not receive them, or they will receive services at the expense of adjudicating largely faultless parents as neglectful. The fix, however, appears to be a purely legislative one. I cannot sign onto a majority opinion that vaguely expands the scope of MCL 712A.2(b)(3) without a valid basis in law and encourages DHHS to litigate this case in that manner.

10

### III. CONCLUSION

Like the majority, I would conclude that the trial court did not clearly err when it found that jurisdiction was not properly asserted under either MCL 712A.2(b)(1) or (b)(2). Unlike the majority, I would hold that when the Legislature chose to statutorily define the term "neglect," it implemented a culpability requirement in *both* MCL 712A.2(b)(1) and (b)(2). To the extent that *Jacobs* held otherwise as it relates to MCL 712A.2(b)(2), I would hold that *Jacobs* has been negated by the codification of "neglect" in MCL 722.602(1)(d). I disagree with the majority that MCL 712A.2(b)(3) may support a finding of jurisdiction in this circumstance. I do not believe that any specialized meaning of "homeless" applies in this context. Moreover, I do not believe that it is consistent to simultaneously find that respondent did not act in a culpable manner for purposes of MCL 712A.2(b)(1) or (b)(2), while also considering the child homeless on the basis of respondent's actions for purposes of MCL 712A.2(b)(3). For these reasons, I concur in part with, and dissent in part from, the majority's opinion.

Richard H. Bernstein

11

STATE OF MICHIGAN

SUPREME COURT

*In re* D. V. LANGE, Minor.

No. 166509

_____

ZAHRA, J. (*dissenting*).

This is a tragic case that involves a troubled child who was exposed to trauma and abuse while in the care of his family of origin. Respondent mother adopted the child ("DVL") when he was five years old, knowing he suffered from significant behavioral disorders.[1] Despite many tribulations,[2] respondent provided DVL with care and

_____

[1] Respondent adopted DVL in a single-parent adoption when he was five years old. Respondent also shares legal custody of two other children with her former spouse.

[2] Over the years, DVL repeatedly attempted to set fires in the family home and injure the family pets. He also exhibited sexually inappropriate behaviors at home and while in placement. Between the ages of 10 and 13, DVL was hospitalized six or seven times to receive psychiatric care for threatening to kill his parents and siblings. The hospitalizations were typically two weeks in duration and were followed by outpatient treatment.

During this time, respondent's former spouse would sometimes provide for DVL's care and maintenance. Indeed, she paid for 13-year-old DVL's treatment at a year-long out-of-state residential treatment program. However, respondent testified that her former spouse refused to allow DVL at her home in August or September of 2020. Yet, as of April 2021, respondent testified that respondent would sometimes have all her children, i.e., the children she shared with her former spouse and DVL, over to her house. She explained:

> Initially, [her former spouse] was against the other two boys being [at her home] when [DVL] was there, but [her former spouse] had no say over what went on in my household. So yes, they were coming and they were staying with me while [DVL] was there.

maintenance such that he was never viewed as a child of neglect. On June 4, 2021, then 13-year-old DVL attempted to start a fire in the home and threatened suicide. Respondent took him to a hospital, seeking admission into an inpatient treatment program. DVL remained at the hospital for more than a month, and he was provided with basic care. Still, the hospital was unable to secure a placement for DVL with any juvenile inpatient treatment program. Medical records suggest that DVL was not cleared for discharge on July 8, 2021, but the hospital cleared him for discharge the following day, recommending he engage in intensive outpatient treatment.

Respondent refused to pick DVL up from the hospital or allow him into the family home. She insisted that the hospital had not yet provided him proper pediatric psychiatric care. She also maintained that any outpatient services offered to DVL through the Department of Health and Human Services (DHHS) would not be efficacious.[3] In the face of respondent's refusal to pick DVL up from the hospital and return him to the family home, on July 16, 2021, DHHS filed a petition alleging that respondent's abandonment of DVL required the court to assume jurisdiction over DVL. At the adjudication, respondent offered poignant testimony explaining that she feared that if DVL returned home, he would harm himself, her, and others within the household.

---

After staying six months in the out-of-state program, DVL was dismissed, allegedly for sexually inappropriate behavior with other residents. DVL returned to respondent's home in April 2021.

[3] In support of this proposition, respondent maintains that DVL had previously received outpatient care on several occasions, and even when followed by brief periods of inpatient psychiatric treatment, outpatient care was not efficacious.

The trial court declined to exercise jurisdiction over DVL, finding no basis to conclude that respondent had been neglectful or abusive. DHHS appealed, and the Court of Appeals, in a split decision, reversed the trial court's judgment and held that the court clearly erred by declining to exercise jurisdiction over DVL based on both MCL 712A.2(b)(1) and (2). Respondent applied for leave to appeal in this Court, and in lieu of granting leave, we ordered oral argument on the application. *In re Lange*, 513 Mich 1032 (2024).

The majority opinion holds that a respondent may be excused from refusing to provide care and maintenance to a child when " 'other barriers prevented [the] respondent from being able to take [their child] home, notably, the risk of danger to the family . . . .' "[4] I disagree. A respondent's subjective perspective of risk and lack of culpability are not relevant to the statutory objective of a trial court assuming jurisdiction over a child under the Child Abuse and Neglect Prevention Act (CANPA), MCL 722.601 *et seq*. The statutory objective of CANPA is the protection of the child. Even an entirely blameless parent may fail to provide care and maintenance for a child. Under those circumstances, DHHS is obligated to investigate and take action to protect the child.[5] The parent's subjective belief that a child is at risk of self-harm or harming others does not relieve DHHS of this responsibility. Interestingly, once the trial court in this case declined to exercise

---

[4] *Ante* at 9 n 2, quoting *In re Holbrook*, 513 Mich 898, 901 (2023) (CAVANAGH, J., concurring) (alteration omitted).

[5] MCL 400.115b(2).

jurisdiction, DHHS immediately informed the court that it would file another petition because no one was then providing care and maintenance for DVL.

This is not a novel issue or one of first impression. In fact, last term we reviewed very similar issues. In *In re Holbrook*,[6] we expressly asked the parties to address whether *In re Hockett*[7] was correctly decided. In *In re Hockett*, the Court of Appeals addressed the phrase "when able to do so" under MCL 712A.2(b)(1). As in the instant case, the respondent-mother in *In re Hockett* "was unable to manage the complex mental health needs of her child."[8] The panel concluded:

> The referee correctly determined that respondent declined to retrieve her child upon discharge. The referee also correctly noted that respondent had the physical capacity to retrieve her minor child and did not do so. Our concern is that this mother, who took desperate action to get care for her child, is now labeled "unfit" and listed on a registry for persons who acted to harm children when she, in fact, was seeking to protect her child. The scant and costly resources available for mental healthcare for children likely places other parents in the same situation as this respondent. We can only look to our policymakers for a resolution to this conundrum. However, "culpability is not a prerequisite" for court intervention under MCL 712A.2(b)(2). *In re Jacobs*, 433 Mich 24, 41; 444 NW2d 789 (1989). Respondent's admitted inability, not her *unwillingness*, to care for NRH's special needs with the level of assistance she was receiving, along with her homelessness, rendered NRH's environment a place of danger for the seriously ill child and, thus, statutorily unfit.[9]

---

[6] *In re Holbrook*, 510 Mich 1085, 1085 (2022).

[7] *In re Hockett*, 339 Mich App 250; 981 NW2d 534 (2021).

[8] *Id*. at 255.

[9] *Id*. at 255-256.

Ultimately, this Court vacated *In re Holbrook* as moot because the child aged out of the court's jurisdiction.[10]  Still, Justice CAVANAGH wrote a concurring statement, joined by Chief Justice CLEMENT, observing that

> [t]he laws on the books simply do not account for parents who are overwhelmed by their children's mental health crises and need state intervention.  It strikes me as fundamentally unfair to deem parents faced with such insurmountable challenges as unfit or neglectful.

> \* \* \*

> . . . Cases like this, where parents are undeserving of those possible consequences, illustrate why reform is needed.  "The scant and costly resources available for mental healthcare for children likely places other parents in the same situation as this respondent.  We can only look to our policymakers for a resolution to this conundrum."[11]

The Legislature has taken initial steps to address the concerns raised in the *Holbrook* concurrence, but, to date, no legislation has been enacted.[12]

This majority opinion ignores governing statutory text and precedents.  This Court has long held that jurisdiction over a child is proper regardless of whether parents are at

---

[10] *In re Holbrook*, 513 Mich 898 (2023).

[11] *Id*. at 902-903 (CAVANAGH, J., concurring), quoting *In re Hockett*, 339 Mich App at 255-256.

[12] Michigan House Bill No. 6149 of 2023 currently proposes amending MCL 712A.2(b)(3) to include the following subparagraph:

> (E) The juvenile is without proper or necessary support, care, or services due to the juvenile's special medical, mental health, educational, or social needs through no fault of the juvenile's parents, guardian, or other custodian.  As used in this [subparagraph], "no fault" means that the court finds that the parent, custodian, or legal guardian has sought state and local assistance and resources and is still unable to provide the support or get the care or services needed by the juvenile.

fault for the conditions that gave rise to jurisdiction. Indeed, more than 30 years ago, in *In re Jacobs*, we specifically rejected the contrary contention:

> We recognize that the respondent has not intentionally or culpably neglected her children. *The purpose of the juvenile code, however, is to protect children from an unfit home, not to punish bad parents.* Were we to require a showing of culpable neglect before a probate court may exercise jurisdiction, an entire class of children, i.e., those neglected by blameless parents, would remain neglected.[13]

The majority opinion does not address this basic principle of Michigan family law. Further, since *In re Jacobs* was decided, the Legislature acted to provide a consistent meaning for the term "neglect" under *both* MCL 712A.2(b)(1) and (2) by incorporating the definition from MCL 722.602. MCL 722.602(1)(d) defines "neglect" as

> harm to a child's health or welfare by a person responsible for the child's health or welfare that occurs through negligent treatment, including the failure to provide adequate food, clothing, shelter, or medical care, *though financially able to do so*, or the failure to seek financial or other reasonable means to provide adequate food, clothing, shelter, or medical care.[14]

At the time *In re Jacobs* was decided, "[n]eglect" was not "defined in the juvenile code, although the term appear[ed] in both the jurisdictional provisions quoted above and the subsection governing the termination of parental rights, MCL 712A.19a(e)."[15] The

---

[13] *In re Jacobs*, 433 Mich 24, 41; 444 NW2d 789 (1989) (quotation marks and citation omitted).

[14] Emphasis added.

[15] *In re Jacobs*, 433 Mich at 33.

Court engaged in "a comparison of these jurisdictional provisions [to shed] light on the proper construction of 'neglect' in [the context of MCL 712A.2(b)(2)]:"[16]

> According to [MCL 712A.2(b)(1)], jurisdiction may be conferred upon the probate court if a parent, "when able to do so," neglects or refuses to provide necessary support or care. This subsection, which uses "neglect" as a verb, is subjective on its face. By inserting "when able to do so," the Legislature has created a "built-in" culpability requirement.
>
> [MCL 712A.2(b)(2)], on the other hand, uses "neglect" as a noun and speaks to the objective condition of the home. Jurisdiction may be conferred under this subsection if the home is *in fact* an unfit place for the child to live. This subsection, by its own terms, mandates an inquiry into the objective state of being neglected rather than an examination of the individual causes or reasons for the neglect. We agree with Judge BOYLE that [MCL 712A.2(b)(2)] contemplates the assumption of jurisdiction in both situations.[17]

Thus, *In re Jacobs* reasonably interpreted MCL 712A.2(b)(1) to include a subjective component of neglect. However, our Legislature later expressly defined "neglect" in *both* MCL 712A.2(b)(1) and (2).[18] The term "neglect" as currently defined in both MCL 712A.2(b)(1) and (2) no longer has an element of culpability because it is not defined to include a *mens rea* requirement. Our Legislature's plain statement that a parent must "provide adequate food, clothing, shelter, or medical care, [when] financially able to do so," does not require much more definition. A parent's financial ability is not a subjective matter. This amendment confirms that the Legislature intended to cabin the subjectiveness of the phrase "able to do so" under MCL 712A.2(b)(1) and ensure that DHHS provides

---

[16] *Id*.

[17] *Id*. at 33-34.

[18] See 2018 PA 58.

services to destitute parents so they may correct this specific condition before it leads to a child's removal.[19]

---

[19] The majority does not decide "whether [*In re*] *Jacobs* remains good law despite the amendments of the statute. Instead, [the majority] ground[s] [its] analysis in the current text of MCL 712A.2(b)(2), which now includes the definition of 'neglect' in MCL 722.602(d)(1)." *Ante* at 11 n 3. In contrast, Justice BERNSTEIN "would hold that when the Legislature chose to statutorily define the term 'neglect,' it implemented a culpability requirement in *both* MCL 712A.2(b)(1) and (b)(2)." *Ante* at 11 (BERNSTEIN, J., concurring in part and dissenting in part). Oddly enough, he reaches this conclusion without even mentioning the language of the amendment. Instead, he simply says that "[t]here would have been little sense for a parent to be placed on a registry if the Legislature did not believe that committing neglect, a finding required by both MCL 712A.2(b)(1) and (b)(2), did not necessarily include a finding of parental culpability." *Ante* at 4 n 2. To the contrary, I believe it makes a good deal of sense to protect "an entire class of children, i.e., those neglected by blameless parents[.]" *In re Jacobs*, 433 Mich at 41.

The majority opinion also concludes that the trial court properly declined to exercise jurisdiction under MCL 712A.2(b)(2). Specifically, the majority states:

> In order for there to be "neglect" as defined in MCL 722.602(1)(d), there must be "negligent treatment." That term is not defined by the statute, which only states that "negligent treatment" includes "the failure to provide adequate food, clothing, shelter, or medical care, though financially able to do so, or the failure to seek financial or other reasonable means to provide adequate food, clothing, shelter, or medical care." MCL 722.602(1)(d). See Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* (St. Paul: Thomson/West, 2012), p 132 ("The verb *to include* introduces examples, not an exhaustive list."). These examples do not fit the instant situation because respondent did at least seek other reasonable means to provide shelter or medical care, as she has consistently tried to obtain inpatient treatment for DVL.

I fail to understand how "[t]hese examples do not fit the instant situation"; rather, they precisely fit. Respondent not only failed but also refused to provide DVL adequate food, clothing, shelter, or medical care. Nothing in the definition of "neglect" suggests that attempting to obtain inpatient treatment for DVL is an acceptable alternative to actually providing DVL care and maintenance, especially when a parent is financially able.

8

Moreover, MCL 712A.18(1) suggests that the trial court in this case improperly considered the "substantial risk of harm to the juvenile or society" when determining whether the court should exercise jurisdiction.[20]  MCL 712A.18(1) instructs that "if the court finds that a juvenile is within this chapter, the court shall order the juvenile returned to his or her parent if the return of the juvenile to his or her parent would not cause a substantial risk of harm to the juvenile or society."[21]  In other words, the "substantial risk of harm to the juvenile or society" must be considered after the court has taken jurisdiction, but there is no statutory indication that it must be considered when the court is contemplating whether to exercise jurisdiction.

The interpretation of MCL 712A.2(b)(1) and (2) adopted in the majority opinion does nothing to protect troubled children, and it subordinates the needs of a child to a parent's subjective understanding of their ability to provide "care and maintenance." Currently, Michigan law has but one exception allowing parents to refuse to provide a child with necessary and proper maintenance or simply abandon a child, which is the Safe Delivery of Newborns Law, MCL 712.1 *et seq*.  Otherwise, refusing to provide support for or abandoning a child is a felony.[22]  And here, notwithstanding the extremely difficult

---

[20] See MCL 712A.18(1), as amended by 2020 PA 389.

[21] *Id*.

[22] MCL 750.161(1) provides:

> A person who deserts and abandons his or her spouse or deserts and abandons his or her children under 17 years of age, without providing necessary and proper shelter, food, care, and clothing for them, and a person who being of sufficient ability fails, neglects, or refuses to provide necessary and proper shelter, food, care, and clothing for his or her spouse or his or her children under 17 years of age, is guilty of a felony, punishable by

situation in which respondent found herself, there is no question that respondent was able to provide some necessary and proper care for DVL, including *shelter, food, and clothing*. She refused to do so despite the hospital staff's determination that DVL was cleared for discharge. Respondent's refusal to pick DVL up from the hospital because she disagreed with a psychiatrist's recommendation is simply not relevant to whether the trial court should have exercised jurisdiction over DVL under MCL 712A.2(b)(1). Respondent, not the hospital, is ultimately legally responsible for DVL's ongoing care and maintenance. And by refusing to take custody of DVL and instead abandoning him at a hospital, respondent in fact withdrew her protection, support, or help from DVL.[23]

The majority opinion improperly indulges respondent by sharing her subjective belief that "other" barriers excuse her from providing care and maintenance to DVL. For instance, the majority too readily agrees that "[r]espondent . . . *reasonably* concluded that DVL could not live in the home without putting DVL, her other children, and herself in harm's way."[24] Respondent testified that her other children have lived with their other parent since before DHHS had even sought custody of DVL. She also testified that, initially, her former spouse "was against the other two boys being [at my home] when [DVL] was there, but she had no say over what went on in my household."

---

imprisonment in a state correctional facility for not less than 1 year and not more than 3 years, or by imprisonment in the county jail for not less than 3 months and not more than 1 year.

[23] "Abandon" is defined in this context as "to withdraw protection, support, or help from." *Merriam-Webster's Collegiate Dictionary* (11th ed).

[24] *Ante* at 9 (emphasis added).

10

From all accounts, DVL's behavior presented the same risk of harm to respondent or her other children before the June 4, 2021 incident that he would have presented on July 9, 2021, the date on which the hospital cleared DVL for discharge and respondent refused to pick him up from the hospital. Both the majority opinion and the Court of Appeals majority express "skepticism regarding how DVL could become dischargeable after one day without receiving additional treatment."[25] Yet, I question how respondent could insist that DVL and her other children stay in her home together before the June 4, 2021 incident and then suddenly believe that he presented such a continuing danger to herself and her other children that intensive outpatient treatment would not meaningfully aid DVL.

The fact remains that a psychiatrist at the hospital cleared DVL to return home. Respondent disagrees with the psychiatrist's recommendation, noting the lack of a treatment plan from a pediatric psychiatrist. Perhaps there is good reason to question this expert medical conclusion. But psychiatrists can and do treat adolescents such as DVL. Moreover, respondent's refusal to pick DVL up from the hospital because she disagreed with the psychiatrist's recommendation is simply not relevant to whether the trial court should have exercised jurisdiction over DVL under MCL 712A.2(b)(1).

DVL was in fact cared for at the hospital for over a month before the hospital cleared him for discharge. Respondent simply disagrees with the sort of treatment DVL would be provided after his discharge, which is outside her purview and does not justify abandoning

---

[25] *Ante* at 2 n 1, citing *In re Lange*, unpublished opinion of the Court of Appeals, issued November 2, 2023 (Docket No. 362365), p 5 n 4.

11

DVL. It is respondent, not the hospital, that is ultimately legally responsible for DVL's ongoing care and maintenance. In sum, a parent's subjective fear that a child may be at risk of self-harm or harming others does not justify the parent's withdrawal of all maintenance or care from the child.

I am also troubled that the majority opinion accepts as fact that "[e]ven had respondent worked with DHHS to obtain outpatient services, those services had failed in the past, and there was no indication that such services would provide respondent with sufficient power, skill, or resources to enable DVL to live at home safely . . . ."[26] Yet, DVL has never previously been provided with the very intensive in-home outpatient services that were offered. Respondent categorically refused any outpatient services, insisting that similar services had not previously worked. Respondent's position is essentially that if DVL does not receive the treatment she believes is necessary, she is entitled to abandon DVL and obtain more substantive services from the state. Instead of squarely rejecting this position, the majority opinion again indulges respondent, stating that she "did at least seek other reasonable means to provide shelter or medical care, as she has consistently tried to obtain inpatient treatment for DVL."[27]

Respondent wants the family court to take jurisdiction of DVL, but only on her terms. In part, she does not want to be labeled an unfit parent and prefers that the court assume jurisdiction by having DVL found "dependent" because he is "homeless." Having a court declare DVL "homeless" apparently spares respondent from being deemed an unfit

---

[26] *Ante* at 9-10.

[27] *Ante* at 11.

parent but does not allow the court to take custody of DVL, which, in turn, permits DHHS to provide him additional care and maintenance. Respondent's attorney and DVL's lawyer-guardian ad litem (LGAL) agree that declaring DVL "homeless" is the ideal solution. While I acknowledge this case presents a heart-wrenching situation, I disagree that declaring DVL homeless is ideal. Simply put, a parent who causes their child to become homeless has in fact neglected or abandoned the child. Further, the notion adopted by the majority opinion—that a parent can dictate the scope and extent of a treatment plan—is not supported by statute and is certain to create more problems than it purports to solve.[28]

For these reasons, I dissent.

Brian K. Zahra

THOMAS, J., did not participate because the Court considered this case before she assumed office.

---

[28] The majority opinion accepts the invitation from respondent and DVL's LGAL to remand this case to the trial court to address whether MCL 712A.2(b)(3) may provide an adequate basis for jurisdiction. MCL 712A.2(b)(3) allows a court to take jurisdiction over a juvenile "[i]f the juvenile is dependent and is in danger of substantial physical or psychological harm." Under MCL 712A.2(b)(3)(A), a juvenile may be found to be dependent when "[t]he juvenile is homeless or not domiciled with a parent or other legally responsible person."

This issue has never been raised by the parties and is therefore unpreserved. Further, there has been no claim that DVL lacks a home or residence. Moreover, DVL is currently over 17 years old and DHHS is not bound to claim he is "dependent," especially given the evidence in the lower court record that respondent has rarely visited DVL since the trial court ordered DHHS to assume custody.